EXECUTION VERSION

## TRADEMARK LICENSE AGREEMENT

THIS TRADEMARK LICENSE AGREEMENT (this "*Agreement*") by and between Martin Birzle, an individual ("*Licensor*"), and Sream, Inc., a California corporation ("*Licensee*"), is made and entered into this _01_ day of _August_, 2013 (the "*Effective Date*").

## BACKGROUND

A.     Licensor is the owner of certain registered and unregistered trademarks, names, designs and logos, along with associated trademark applications and registrations filed with the U.S. Patent and Trademark Office, and incorporated herein by reference (collectively, the "*Mark*," which Mark is identified and/or referenced at **Schedule A** attached hereto).

B.     Licensee manufactures and sells certain products identified on **Schedule B** attached hereto (each a "*Product*" and collectively, the "*Products*").

C.     Licensee desires to use the Mark in conjunction with the sale of the Products in the United States of America (the "*Territory*") and Licensor desires to grant a license to use the Mark to Licensee on the terms and conditions set forth below.

D.     In March 2010, Licensor previously granted to Licensee's president, Jay Faraj, exclusive license rights to the Mark (the "Faraj Agreement"). By and through this Agreement, Licensor seeks to replace Mr. Faraj as the exclusive license with Licensee (an incorporated entity under the management of Mr. Faraj, namely Sream, Inc.), and Mr. Faraj seeks to assign all rights to the Faraj Agreement to Licensee concurrent with the execution of this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and of the mutual promises hereinafter set forth, the parties agree as follows:

1.     **License.**

1.1     <u>Grant and Acceptance of License.</u>  Subject to the provisions of <u>Section 1.2</u>, Licensor grants to Licensee, subject to the terms and conditions of this Agreement, an exclusive, nontransferable, terminable, royalty-bearing license to use the Mark in conjunction with the manufacturing and sale by Licensee of the Products hereunder.

1.2     <u>Scope of License.</u>

(a)     This Agreement confers an exclusive license to Licensee to manufacture and sell Products bearing the Mark to any third party in the Territory, solely during the Initial Term (as defined in <u>Section 9.1</u> below) of this Agreement (hereinafter, "*Authorized Distribution*"). Notwithstanding anything to the contrary in this Agreement, Licensor reserves the right, at all times during the Term (as defined in <u>Section 9.1</u> below), to manufacture,

distribute, and sell the Products or other products labeled with the Mark that are in nature similar to, and/or competitive with, the Products, outside the Territory. After the expiration of the Initial Term and at all times during the Renewal Term (as defined in <u>Section 9.1</u> below), Licensee shall only have the right to manufacture and sell the Products to Licensor or any of his designee(s) for further distribution and sale to third parties anywhere in the world, including, without limitation, the Territory. All sales of Products by Licensee to Licensor or any of his designees during the Renewal Term shall be subject to such terms and conditions (including pricing), as shall be negotiated in good faith by the parties before the end of the Initial Term. Once determined by the parties, **Schedule D** to this Agreement shall be amended to include all of the terms and conditions applicable to such Renewal Term sales.

(b)  Licensee shall use the Mark solely in the Territory.  Any unauthorized sales of Products by Licensee outside of the Territory to any third party shall be grounds for immediate termination by Licensor, at Licensor's option, and shall obligate Licensee to the payment of damages in an amount equal to $5,500 per unauthorized sale transaction in addition to whatever other liabilities may be incurred by Licensee as a result of such unauthorized sales. Licensee hereby agrees and acknowledges that Licensor would be unduly prejudiced and that the measure of actual damages suffered by Licensor would be difficult to ascertain, in the event that Licensee sold Products outside the Territory. Therefore, Licensee agrees that the liquidated damages provision set forth herein is reasonable under the circumstances to protect Licensor's interests and that such damages shall be in addition to, and not in lieu of, any other remedies available to Licensor under this Agreement.

2.  **<u>Ownership of Mark</u>**.

2.1  <u>Ownership</u>.  Licensee acknowledges the ownership of the Mark, including all goodwill associated therewith, in Licensor.  Licensee agrees that he will do nothing inconsistent with such ownership and that all use of the Mark by Licensee shall inure to the benefit of and be on behalf of Licensor. Licensee agrees that nothing in this Agreement shall give Licensee any right, title or interest in the Mark other than the right to use the same in accordance with this Agreement, and Licensee agrees that he will not attack or otherwise challenge Licensor's rights in the Mark, the title of Licensor to the Mark, or the validity of the license to use the same hereunder.

2.2  <u>Use of Mark</u>.  Licensee shall use the Mark in the form and manner and with appropriate designations as set forth on **Schedule B**, in accordance with Licensor's Brand Image Policy (the **"*Brand Image Policy*"**), which is attached hereto as **Schedule C**, or as prescribed from time to time by Licensor.

2.3  <u>Non-Circumvention of Licensor's Mark</u>.  Licensee further agrees not to use, seek to register, in any jurisdiction, any trademark, service mark, or domain name resembling or confusingly similar (as determined by Licensor in his sole discretion) to the Mark, or that dilutes the Mark or any of Licensor's other marks. If any application for registration is, or has been filed in any country by Licensee that relates to any mark or domain name that, in the sole opinion of Licensor, is confusingly similar, deceptive or misleading with respect to the Mark or any of Licensor's other marks, or that dilutes the Mark or any of Licensor's other marks, Licensee shall immediately cease use and, at Licensor's discretion, immediately abandon any



such application or registration, or assign it to Licensor. Licensee will not alter, remove, deface or obscure any notice of trademark or other proprietary right on any Product bearing the Mark and will not add to any Product any other trademark or notice of any other proprietary right, except that, subject to strict compliance with the provisions of this Agreement, including, without limitation, Section 3 below, Licensee may create, develop, patent and, provided that Licensee has obtained the written consent of Licensor (which consent may be withheld at Licensor's sole discretion) at least sixty (60) days prior thereto, incorporate new technologies into the Products, for which new technologies Licensee patent at any time during and after the expiration of the Term In the event of any infringement, misappropriation or violation relating to the activities of Licensee or any of his employees, agents, representatives, or sales representatives, Licensee will, at his own cost, take all steps reasonably necessary to terminate any such infringement, misappropriation or violation.

2.4    Licensee's Right to Enforce the Mark in the United States. Throughout the term of this Agreement, including all renewals, Licensor grants Licensee all rights to sue to obtain injunctive relief for past and future infringement of the Mark, to recover damages that Licensor has or may have in profits and damages for past and future infringement of the Mark, including but not limited to the right to compromise, sue for and collect said profits and damages. The parties intend for the rights afforded under this paragraph to be tantamount to an assignment of said right without actually being an assignment. In other words, Licensor grants enforcement rights that amount to those of an assignee as contemplated by *Ventures, LLC v. Pittsburg Wholesale Grocers, Inc.*, 2013 WL 1007666 N.D.Cal.,2013; *Spin Master, Ltd. v. Zobmondo Entertainment, LLC* 2011 WL 3714772 C.D.Cal.,2011; and *Waits v. Frito–Lay, Inc.*, 978 F.2d 1093, 1108–09 (9th Cir.1992)).

Licensee further has the right to enter agreement with legal counsel for the enforcement of said rights, including by way of contingency arrangements, and Licensor acknowledges that said counsel shall be entitled to a lien on all recoveries of third party infringement of the Mark. ~~Licensor~~ will, at his own cost: (a) provide such assistance related to such proceeding as Licensor *Licensee* may reasonably request; and (b) assist Licensor in enforcing any settlement or order made in connection with such proceeding. In other words, Licensor agrees to reasonably cooperate with any enforcement of the Mark in the United States, including without limitation, to produce documents related to the ownership and/or use of the Mark, and to comply with deposition notices and/or subpoenas.

2.5    Notice to Licensor of all Anticipated or Pending Lawsuits Related to Licensor's Intellectual Property. Licensee will contemporaneously notify Licensor of any infringement, misappropriation or violation of any trademark or other proprietary right of Licensor that comes to Licensee's attention and/or of any litigation that Licensee has commenced to enforce the Mark.

3.    **Quality Standards**.

3.1    Standards of Use. Licensee shall use the Mark and manufacture Products in accordance with Licensor's standards set forth in the Brand Image Policy attached hereto as **Schedule C** and incorporated herein by this reference. Licensor reserves the right to change or modify any of the terms and conditions contained in the Brand Image Policy at any time in his

sole and absolute discretion. Any changes or modifications will be effective upon thirty (30) days' written notice to Licensee. Licensee's continued use under the Brand Image Policy following notice of revisions will constitute Licensee's acceptance of such changes or modifications. The foregoing notwithstanding, Licensee shall have the right to contest the application of any such changes or modifications in the Brand Image Policy in the event such changes or modifications impose an unreasonable burden on Licensee in the performance of his obligations hereunder. In such case, Licensee shall notify Licensor in writing within thirty (30) days of receipt of the proposed changes or modifications by Licensor, of Licensee's reasons for asserting that Licensor's changes or modifications are commercially unreasonable and the parties shall then negotiate in good faith mutually acceptable revised terms for the Brand Image Policy. Licensee agrees not to use any other trademarks, service marks, designs, logos, slogans or color schemas in combination with any of the Mark without the prior written approval of Licensor or as otherwise outlined herein. Licensee agrees that he will not sell any Products bearing the Mark unless such Products strictly adhere to the Brand Image Policy. Licensee agrees that the use of the Mark by Licensee shall remain at all times under the exclusive control of Licensor. As an integral part of this quality control, Licensee agrees that the Products bearing the Mark shall be of the highest quality available and shall, at a minimum, be in compliance with all applicable products liability laws and regulations of the Territory. Licensor agrees to provide ongoing consultation and assistance to Licensee to address any quality issues.

3.2     <u>Inspection Rights</u>. Licensee acknowledges that Licensor has the right to inspect the quality and nature of the Products bearing the Mark, and to approve or reject those Products. Licensor shall have the sole discretion to determine whether Licensee is in compliance with Licensor's quality control standards. Licensee agrees to collect, maintain and furnish to the Licensor, at Licensor's request, representative samples of Products and any marketing materials bearing the Mark to assure conformance with all quality standards. Licensor or any designee that has been previously identified in writing by Licensor and disclosed to Licensee as an authorized designee ("*Authorized Designee*"), shall have the right during regular business hours to inspect Licensee's premises, inventories, manufacturing facilities and accounting books and records at any time, in order to determine whether Licensee is adhering to the requirements of this Agreement relating to the use of the Mark. Licensee shall permit Licensor or any Authorized Designees to access his premises, facilities and/or books and records during regular business hours. If Licensor determines that Licensee is not in compliance with the standards set forth in this <u>Section 3</u> and the Brand Image Policy, Licensee shall immediately cure the non-compliance or discontinue such non-conforming use, at Licensor's sole discretion.

3.3     <u>Records</u>. Licensee shall maintain separate corporate, financial and accounting books and records for the Products bearing the Mark at all times during the Term. Licensee agrees to maintain correct and complete financial books and accounts for his business, which shall be prepared in accordance with United States Generally Accepted Accounting Principles ("*GAAP*") and shall correctly reflect all of the transactions, items of income and expense and all assets and liabilities of Licensee's business as it relates to the Products. Licensor or any certified public accountant designated by Licensor shall be permitted to conduct an audit of the business of Licensee, during regular business hours and upon 48-hour written notice to Licensee, to ensure compliance with this Agreement and to assess Licensee's financial position at any time during the Term.



3.4     Manufacturing Facilities.    Licensee agrees that he shall be the sole manufacturer of the Products bearing the Mark to be sold by Licensee hereunder, except that Licensee may use subcontractors from time to time, provided that a complete list of such subcontractors is provided to Licensor in writing within ten (10) days of the beginning of any such subcontracting relationships.    Notwithstanding anything to the contrary elsewhere in this Agreement, Licensee shall remain at all times fully responsible for the quality of the Products to be sold hereunder and Licensor shall, under no circumstances whatsoever, have any obligations, duties, or liabilities with respect to any such subcontractors.

3.5     Products.    The rights granted under this Agreement to Licensee shall apply solely to the Products set forth on **Schedule B**.  **Schedule B** may be amended from time to time by the parties in writing to reference all approved designs and concepts which the parties have agreed to commercialize as part of the Products, in accordance with the provisions of Section 3.6.

3.6     Brand Development.    Licensee shall be permitted to incorporate his own creative designs and concepts into the Products, in accordance with the Brand Image Policy, so as to develop the goodwill of the Mark as a new and distinctive brand (the "**Brand**"), provided that all such new designs and concepts shall receive Licensor's approval, which approval may be withheld in Licensor's sole discretion, prior to being eligible for bearing the Mark and for Authorized Distribution.    Licensor shall be solely responsible, directly or through agents that Licensor may hire from time to time for such purposes, for the promotion and marketing of the Brand in the Territory, in Licensor's sole discretion, except that Licensee shall be responsible for the cost of such promotional and marketing efforts during the Initial Term.    The parties agree that the budget for promotion and marketing during the Initial Term of this Agreement shall be equal to a maximum of 2.5% of Gross Sales (as defined in Section 5.1 below) for all Products calculated on a quarterly basis.    Licensor or his designees shall provide all marketing, advertising or promotional materials incorporating the Mark to Licensee.    Any marketing, advertising or promotional materials incorporating the Mark that is not directly provided by Licensor to Licensee (the "**New Material**") must be provided to Licensor or his designees for review and written approval before the dissemination or use of any such New Material by Licensee, which approval will be granted at Licensor's sole and absolute discretion.    Licensor agrees to provide ongoing consultation and guidance to Licensee regarding all aspects of Licensee's performance of this Agreement during the Term.    To further enhance the distinctiveness and protect the goodwill of the Brand, Licensee agrees that, during the Term, he will not manufacture or offer for sale any other brand or line of products that substantially imitate, copy, or are confusingly similar to the design and styling of the Brand or of any other existing brand, mark or line of products of Licensor.

3.7     Third Party Consents.    To the extent that Licensee sells, references or identifies any products and/or services, or utilizes any trademark, service mark, trade name, trade dress, logo, logo type, tagline, icon or any other intellectual property (registered or unregistered) with respect to any products and/or services (the "**Content**") of any third party not a signatory hereto (each, a "**Third Party**"), Licensee hereby represents and warrants that: (i) his use of the Third Party Content does not and will not violate, misappropriate or infringe any copyright, patent, trademark, service mark, trade secret or any other personal, privacy or moral right or any other intellectual property or proprietary right arising under the laws of any jurisdiction of any



person or entity (a "**Third Party Right**"); (ii) Licensee has obtained any and all necessary consents for the use of the Third Party Content; and (iii) Licensee will not place Third Party Content within close proximity to Licensor Content, or otherwise directly or indirectly imply or use Content to imply Licensor's sponsorship, affiliation or endorsement of Third Party Content.

4.    **Disclaimer of Warranty; Waiver**.  Licensor delivers and licenses the Mark, "AS IS, "WHERE IS" AND "WITH ALL FAULTS."  Licensor makes no representation or warranty as to the condition, availability, strength, character, nature, capability, performance, suitability, "pedigree," source or other characteristic of any such item.  LICENSEE WAIVES AND RELEASES ALL RIGHTS AND REMEDIES OF LICENSEE AGAINST LICENSOR, INCLUDING, WITHOUT LIMITATION, ANY CLAIM FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE, ECONOMIC OR CONSEQUENTIAL DAMAGES, COVER OR LOSS OF PROFIT, REVENUE OR USE.

5.    **Royalties**.  During the Initial Term, in exchange for the license rights granted hereunder, Licensee shall make the following royalty payments to Licensor:

5.1    Sales    by    Licensee.    With    respect    to    sales    of    Products (except for Collaborations and Customs Products, as such are identified on **Schedule B** attached hereto, the "**Collaborations/Customs Products**") by Licensee, Licensee shall pay to Licensor an amount equal to 12.5% of Gross Sales (as defined below) per calendar month.  With respect to sales of Collaborations/Customs Products, the royalty payments shall be determined by the parties on a case-by-case basis.

For purposes of this Section 5.1, "Gross Sales" shall mean (i) the total wholesale invoice value of all Products' sales to retailers before deductions for operating expenses, cost of goods sold, taxes, interest, customer discounts, returns or allowances, *minus* (ii) the aggregate cost of shipping, freight and insurance charges for all Products sold, per calendar month.

5.2    Sales by Distributors.  Licensee may enter into agreements with resellers or distributors for the resale or distribution of the Products.  For any such approved resellers or distributors, the royalty payments set forth in Section 5.1 shall also apply.

All payments under this Section 5 shall be made in accordance with the terms set forth in Section 7 hereof.

6.    **Decals Sales**.

6.1    Sole Provider.  The parties agree that Licensor shall be the sole provider of all decals bearing the Mark to be affixed to the Products (the "**Decals**").

6.2    Order Procedure.  All orders for Decals by Licensee shall be subject to acceptance in writing by Licensor.  Licensor reserves the right to cancel any orders placed by Licensee, or to refuse or delay shipment thereof, if, and for so long as, Licensee is and remains in breach of this Agreement, without liability of any kind to Licensee or to any other person.

6.3    Payments.  During the Term, Licensor shall inform Licensee as to the current prices for the Decals.  Licensee shall pay Licensor for the Decals as set forth in Section 7.



6.4    Shipping.  All Decals will be shipped by Licensor DAP Licensee's designated point of delivery.  The foregoing notwithstanding, the prices for the Decals invoiced to Licensee by Licensor will include all shipping costs and insurance charges incurred by Licensor in providing the Decals to Licensee's designated point of delivery.

6.5    Title and Risk of Loss.  Title and all risk of loss of or damage to Decals will pass to Licensee upon delivery to Licensee's designated point of delivery.

6.6    Taxes.  Licensor's prices do not include any national, state or local sales, use, value added or other taxes, customs duties, or similar tariffs and fees which may be required to be paid or collected upon the delivery of Decals or otherwise.  Should any tax or levy be made, Licensee agrees to pay such tax or levy and indemnify Licensor for any claim for such tax or levy demanded.  Licensee will pay any withholding taxes required by applicable law.  If applicable, Licensee will supply Licensor with evidence of such payment of withholding tax, in a form acceptable to Licensor to meet the requirements for claiming foreign tax credits on Licensor's income tax return.

7.    **General Payments Terms**.  All royalties' payments due under Section 5 shall be made on a monthly basis, on or before the fifteenth (15th) day of the month immediately following the month in which the applicable Products are sold.  All Decals sales payments due under Section 6 shall be made within thirty (30) days of receipt of the Decals by Licensee.  All payments under Section 5 and Section 6 shall be made by wire transfer of immediately available funds to a bank account of Licensor provided to Licensee in writing.  Interest shall accrue on any delinquent payments owed by Licensee at the rate of eight percent (8%) per annum.  Failure to pay any amounts due Licensor for more than ten (10) days after the due date pursuant to the provisions hereof shall be grounds for immediate termination of this Agreement at the sole discretion of Licensor pursuant to Section 9.

8.    **Confidentiality**.

8.1    Obligations.  Licensee recognizes that he has had, or will have, access to, and knowledge of, matters concerning the business of Licensor, including, without limitation, business, financial situation, products, customers, trade secrets, know-how, formulas, compositions of matter, inventions, techniques, processes, programs, diagrams, schematics, sales and marketing plans, all of which being of a confidential and proprietary nature ("**Confidential Information**").  Licensee covenants that he will (i) use such Confidential Information only in connection with fulfilling his obligations under this Agreement, (ii) during the term of this Agreement and for a period of five (5) years thereafter, hold such Confidential Information in strict confidence and exercise due care with respect to his handling and protection of such Confidential Information, consistent with his own policies concerning protection of his own proprietary and/or trade secret information and (iii) disclose, divulge or publish the same only to such of his employees or representatives as are Qualified Personnel (as defined below) and to no other person or entity, whether for his own benefit or for the benefit of any other person or entity.  Licensee further agrees to return all copies of all Confidential Information in his possession, control or custody immediately upon termination or expiration of this Agreement.  As used herein, the term "Qualified Personnel" means such employees and representatives of Licensee who (x) have a need to know or have access the Confidential Information in order for such



employees or representatives to carry out the purposes of this Agreement and (y) have executed nondisclosure agreements binding them not to use or disclose such Confidential Information except as permitted herein.

8.2    Exceptions.  The obligations contained in Section 8.1 will not apply to Confidential Information which (i) is or becomes public knowledge without the fault or action of Licensee, (ii) is received by Licensee from a third party source, which source received the information without violation of any confidentiality restriction, (iii) is independently developed by Licensee without violation of any confidentiality restriction, (iv) is or becomes available to Licensee on an unrestricted basis from Licensor, or (v) is deemed responsive to a discovery demand in litigation, or in response to a lawfully issued subpoena, provided that such disclosure is made pursuant to a "confidential" and/or "attorneys eyes only designation" as provided for in the protective order governing said litigation.

9.    **Term and Termination**.

9.1    Term.  This Agreement shall be for a continuous term beginning on the Effective Date and ending on the day preceding the third anniversary of the Effective Date ("***Initial Term***"), and shall automatically renew for another one (1) year at the expiration of the Initial Term (the "***Renewal Term***"), on the same terms and conditions (except for such terms and conditions that are made applicable solely to either the Initial Term or the Renewal Term) as set forth in this Agreement (as modified from time to time by the parties).  The Initial Term, together with the Renewal Term, is collectively referred to in this Agreement as the "Term." Notwithstanding the foregoing, either party may terminate this Agreement prior to the expiration of the Term pursuant to Sections 9.2 and 9.3, and with the effect set forth in, Section 9.4.

9.2    Termination by Licensor.  Without prejudice to any other rights which Licensor may have, Licensor can at any time terminate this Agreement, effective upon notice to Licensee, upon the occurrence of any of the following: (i) Licensee does any act to bring the Mark into disrepute; (ii) Licensee breaches any provision, representation or covenant of this Agreement; (iii) Licensor reasonably determines that this Agreement violates any applicable laws, rules or regulations and the party/parties cannot come into compliance with the laws; (iv) the Products allegedly violate any Third Party Rights; (v) Licensee's insolvency, which shall be defined as (i) Licensee's failure to pay his debts as they come due or (ii) when the fair market value of Licensee's assets are less than the value of Licensee's accrued liabilities; (vi) Licensee's assignment for the benefit of its creditors or any other unapproved assignment or transfer of Licensee's rights under this Agreement; or (vii) the placement of Licensee's assets in the hands of a trustee or receiver.

9.3    Termination by Licensee.  Licensee may terminate this Agreement effective upon notice to Licensee, upon the occurrence of any of the following: (i) Licensor no longer owns sufficient proprietary rights in the Mark; (ii) Licensor breaches any provisions of this Agreement; or (iii) Licensee reasonably determines that this Agreement violates any applicable laws, rules or regulations and the party/parties cannot come into compliance with the laws.



9.4     Effect of Termination.  Upon termination of this Agreement, Licensee agrees to: (i) immediately discontinue all use of the Mark, and any term confusingly similar to or dilutive of the Mark; (ii) delete the Mark from his business name; (iii) destroy all printed materials, marketing and promotional materials, and advertisements bearing the Mark; and (iv) return all Confidential Information in his possession to Licensor.  The foregoing notwithstanding, Licensee shall be permitted to continue to sell, existing inventories of Products bearing the Mark to a third party (if, and only if, this Agreement is terminated at any time during the Initial Term), for a maximum of sixty (60) days following the termination of this Agreement (the "**_Grace Period_**").  Licensee hereby agrees and acknowledges that Licensor would be unduly prejudiced and that the measure of actual damages suffered by Licensor would be difficult to ascertain, in the event that Licensee continued to sell Products bearing the Mark to any third party at any time after the expiration of the Grace Period.  Therefore, Licensee agrees that for any sales of Products bearing the Mark to a third party after the expiration of the Grace Period, Licensor shall be entitled to collect liquidated damages in the amount of $1,500 per day after the expiration of the Grace Period, which damages shall be in addition to, and not in lieu of, any other remedies available to Licensor under this Agreement.  Licensee specifically agrees that such liquidated damages are reasonable and fair under the circumstances.  Termination of this Agreement for any reason provided herein shall not relieve either party from his obligation to perform up to the effective date of such termination (including, without limitation, the obligation of Licensee to pay royalties in the event of a termination pursuant to Section 9.3(i)) or to perform such obligations as may survive termination.  The provisions of Sections 2, 3, 4, 8, 9.4, 10, and 12 of this Agreement shall survive any expiration or termination of this Agreement for any reason.  Licensor shall not be liable to Licensee in connection with any costs, damages or losses of any kind as a result of the termination of this Agreement for any reason.

10.    **Indemnification**.  Licensee will at all times defend, indemnify and hold harmless Licensor, his affiliates and all officers, shareholders, directors, managers, members, agents, heirs, successors and assigns of each of the foregoing (collectively, the "**_Indemnified Parties_**") from and against, and pay and reimburse the Indemnified Parties for, any and all liabilities, obligations, losses, damages, costs or expense (including interest, penalties and reasonable attorneys' fees) incurred in connection with any Third Party claims to the extent arising out of, resulting from or relating to:  (i) any claim of violation of a Third Party Right; (ii) any representation, warranty or covenant by Licensee contained herein being untrue in any respect or being breached in any manner; (iii) any alleged negligent, strict liability or intentional act or omission on the part of Licensee, his employees or agents in the performance of his obligations set forth in this Agreement; (iv) an alleged breach of this Agreement;; or (v) Licensee's unauthorized use of the Mark.  In connection with any claim or action described in this Section 10, subject to the provisions of Section 2.3, Licensor will cooperate with Licensee (at Licensee's expense) in connection with the defense and settlement of the claim.  Licensee may not settle the claim without Licensor's prior written consent.  Further, Licensor may participate in the defense and settlement of the claim.

11.    **Sales Outside Territory/Distribution Agreement**.  Licensor agrees during the Term to give Licensee a right of first refusal to manufacture all Products, or any component thereof, to be sold by Licensor outside the Territory.  The parties may, contemporaneously with this Agreement, enter into a manufacturing/distribution agreement with respect to the Products



whereby Licensee shall manufacture Products for resale by Licensor outside the Territory (the "*Distribution Agreement*").

12. **Miscellaneous Provisions**.

12.1 <u>General Covenants</u>. Licensee shall: (i) conduct business in a professional manner that reflects favorably at all times on the Mark and the good name, goodwill and reputation of the Mark and Licensor, (ii) avoid deceptive, misleading, fraudulent or unethical practices that are or might be detrimental to Licensor and the Mark, and (iii) make no false or misleading representations with regard to the Mark or Licensor.

12.2 <u>Costs and Expenses</u>. Except as expressly provided herein or agreed to in writing by the parties, Licensee will pay all costs and expenses incurred in the performance of his obligations under this Agreement.

12.3 <u>Independent Contractors</u>. Neither party will, for any purpose, be deemed to be an agent, partner or franchisee of the other party. The relationship between the parties will only be that of independent contractors. Neither party will have any right or authority to assume or create any obligations or to make any representations or warranties on behalf of any other party, whether express or implied, or to bind the other party in any respect whatsoever.

12.4 <u>Entire Agreement</u>. This Agreement is the entire agreement between the parties and supersedes all prior agreements, negotiations and communications of whatever type, whether written or oral, between the parties hereto with respect to the subject matter of this Agreement.

12.5 <u>Amendment</u>. This Agreement may be amended at any time by mutual agreement of the parties without additional consideration, provided that, before any amendment will become effective, it will be reduced to writing and signed by the parties.

12.6 <u>Arbitration; Applicable Law</u>. In the event of any dispute involving any matter between the parties, whether arising out of this Agreement or otherwise, including any dispute involving the validity of this Agreement, each party shall confer in good-faith by telephone or in person in an effort to resolve the dispute prior to the initiation of the arbitration process described in this section. In the event that the parties are unable to resolve the dispute following such conference (or in the event that either party refuses to confer), the exclusive forum for the resolution of the dispute shall be the Frankfurt am Main Chamber of Commerce and Industry (the "*Frankfurt CCI*"), and the parties shall be bound by the award of a sole arbitrator appointed within ten days of the time of the demand for arbitration. The arbitration shall proceed under the Arbitration Rules of the Frankfurt CCI in effect at the time of the demand for arbitration, and specifically under the Supplementary Rules for Expedited Proceedings of the German Institution of Arbitration e.V. (DIS), without recourse to any court of law except for a request for injunctive relief to enforce a party's right under this Agreement or under the law applicable in the forum in which such injunctive relief is sought (other than injunctive relief to stay the arbitration, which the parties waive the right to seek). The oral hearing shall be held in Frankfurt, Germany, unless the parties agree that either of them may participate by telephone. The substantive law applicable to any claim or counterclaim shall be



the law that would be applied by a court in the Federal Republic of Germany without regard to any conflicts-of-laws rules. The arbitrator shall have the exclusive authority to determine any issue concerning the arbitrability of any dispute, and the parties waive any right they might otherwise have to seek a court ruling on the issue of arbitrability.

12.7    Prevailing Party Attorneys' Fees.    Should any party commence legal action to interpret or enforce the terms of this Agreement, the prevailing party in such action shall be entitled to recover reasonable attorneys' fees and costs.

12.8    Remedies.    Except as otherwise expressly provided in this Agreement, each and all of the rights and remedies provided in this Agreement, and each and all of the remedies allowed at law and in equity, will be cumulative, and the exercise of one right or remedy will not be exclusive of the right to exercise or resort to any and all other rights or remedies provided in this Agreement or at law or in equity.

12.9    Specific Performance.    Licensee acknowledges that any breach of this Agreement may cause irreparable harm, the amount of which may be difficult to ascertain, and therefore agrees that Licensor shall have the right to seek and obtain injunctive relief against Licensee, and specific performance, without the necessity of posting a bond.

12.10   Assignment.    Licensee will not assign or delegate any of its rights, obligations or licenses under this Agreement, and any such assignment or delegation is expressly prohibited and will be void.   The foregoing notwithstanding, Licensee may, upon the prior written consent of Licensor, grant sublicenses with respect to the Mark, provided that any such permitted sublicensees shall agree in writing to be bound by the terms of this Agreement as applicable to Licensee.   Subject to the prohibition contained in this paragraph, this Agreement will be binding upon and inure to the benefit of the successors and permitted assigns of the parties hereto.   Licensor may assign or delegate its rights and obligations under this Agreement without notice to Licensee.

12.11   Severability.    The provisions of this Agreement will be deemed severable and, if any portion will be held invalid, illegal or unenforceable for any reason, the remainder of this Agreement will be effective and binding upon the parties.

12.12   Waiver.    The failure of either party to this Agreement to insist upon strict performance of any covenant or condition hereof, in any one or more instances, will not be construed as a waiver or relinquishment of any such covenant or condition, but the same will be and remain in full force and effect.

12.13   No Third Party Rights.    Licensor does not intend the benefits of this Agreement to inure to any Third Party.

12.14   Construction of Agreement.    It is agreed by the parties that the terms of this Agreement have been fairly bargained for after careful consideration by the parties; therefore, this Agreement shall be enforced, interpreted and construed without regard to its authorship, and no inference shall be drawn by the parties or any Third Party, including any court, by virtue of its authorship.



12.15 <u>Captions</u>. Any captions or headings of the articles, sections, subsections, paragraphs, or subparagraphs of this Agreement are solely for the convenience of the parties, are not a part of this Agreement and will not be used for the interpretation or determination of validity of this Agreement or any provision hereof.

12.16 <u>Counterparts; Electronic Signature</u>. This Agreement may be executed in counterparts, each of which will be deemed an original, and all of which together constitute one and the same instrument. To expedite the process of entering into this Agreement, the parties acknowledge that Transmitted Copies of this Agreement will be equivalent to original documents until such time as original documents are completely executed and delivered. "***Transmitted Copies***" means copies that are reproduced or transmitted via photocopy, facsimile or other process of complete and accurate reproduction and transmission.

12.17 <u>Notices</u>. Unless otherwise provided, any notice or other communication required or permitted under this Agreement shall be given in writing and shall be deemed effectively given (a) upon personal delivery to the party to be notified; (b) when received when sent by e-mail or fax by the party to be notified; <u>provided, however</u>, that notices given by e-mail or fax shall not be effective unless either (i) a duplicate copy of such e-mail or fax notice is promptly given by one of the other methods described in this <u>Section 12.17</u> or (ii) the receiving party delivers a written confirmation of receipt for such notice either by e-mail, fax or any other method described in this <u>Section 12.17</u>; (c) one (1) business day after deposit with an express overnight courier for United States deliveries, or two (2) business days after such deposit for deliveries outside of the United States, with proof of delivery from the courier requested; or (d) three (3) business days after deposit in the United States mail by certified mail (return receipt requested) for United States deliveries. All notices for delivery outside the United States will be sent by facsimile, by e-mail or by express courier. Notices by facsimile shall be machine verified as received. All notices not delivered personally, by facsimile or by e-mail will be sent with postage and/or other charges prepaid and all notices shall be properly addressed to the party to be notified at the address, or facsimile number as follows, or at such other address or facsimile number as such other party may designate by one of the indicated means of notice herein to the other parties hereto as follows, or at such other address as such party may designate by 10 days' advance written notice to the other parties given in the foregoing manner:

    To Licensor:

        Martin Birzle
        Am Rosengarten 3
        67227 Frankenthal
        Federal Republic of Germany
        Facsimile: ( ) ___-____
        E-Mail: mb@backsite.de



To Licensee:

Jay Faraj
Sream, Inc.
12825 Temescal Canyon Rd. Ste. B
Entity City, State, Zip: Corona CA 92883
USA
Facsimile:  (___) ___-____
E-Mail: jfarraj@sbcglobal.net


*[Remainder of page intentionally left blank.]*



IN WITNESS WHEREOF, the parties hereto have executed this Trademark License Agreement as of the day and year first above written.

**Licensor:**

01.08.2013

Martin Birzle

**Licensee:**

Jay Faraj

EXECUTION VERSION

## SCHEDULE A

## MARK

1.      U.S. Trademark Registration Number 3,675,839 for the word mark "ROOR" and its logo in association with goods further identified in the registration in international class 034.

2.      U.S. Trademark Registration Number 2,307, 176 for the word mark "ROOR" and its logo identified below in association with goods further identified in the registration in international classes 025 and 034.

3.      U.S. Trademark Registration Number 2,235,638 for the word mark "ROOR" and its logo identified below in association with goods further identified in the registration in international class 021.

4.      Any and all other registered or unregistered trademark rights in the word mark "ROOR" and in the marks shown below:







<u>EXECUTION VERSION</u>

## SCHEDULE B

## <u>PRODUCTS</u>

1. Water pipes, bubblers, and ash catchers, including without limitation, those with the following attributes:
   a. Size: 8" to 24"
   b. Diameter: 26mm to 60mm
   c. Color: Production and custom colors
   d. Filter type: straight downstream, 10-arm filter, toque, meniscus
   e. Shape: straight or beaker
2. Smoking accessories, such as ash trays, down stem bowls
3. Apparel, such as t-shirts, shirts, and hats
4. Glass cleaner
5. Collaborations
6. Customs
7. Any and all other technological progressions and improvements of the foregoing items.
8. Cypress Hill's Phuncky feel Tips by RooR (Third party's intellectual property)

<u>EXECUTION VERSION</u>

## SCHEDULE C

## <u>BRAND IMAGE POLICY</u>

*Last Update: June 1, 2011*

### 1. <u>Introduction.</u>

This Brand Image Policy (this "***Policy***") is intended for authorized licensees, distributors, sellers, and other third parties who manufacture, distribute or sell products (the "***Products***") that bear the mark **RooR** (the "***RooR Brand***") or **RooR** (the "***RooR Tech Brand***" and collectively with the RooR Brand, the "***Brands***") and sets forth the rules for the proper usage and protection of the Brands' corresponding trademarks set forth on **Exhibit A** attached hereto (collectively, the "***Trademarks***").

All usage of either Brand and all manufacture, marketing and distribution of any Products are subject to and conditioned upon compliance with this Policy, as well as any and all terms and conditions of applicable trademark license, sales, marketing or distribution agreement, as applicable (collectively, "***Agreements***") between you and Martin Birzle ("***Licensor***"). The terms of any such Agreement shall supersede the policies set forth herein to the extent that such policies are inconsistent with such Agreement.

Licensor reserves the right to change or modify any of the terms and conditions contained in this Policy at any time in his sole and absolute discretion. Any changes or modifications will be effective immediately upon thirty (30) days' written notice to you. Your continued use under the Policy following receipt of the revised Policy will constitute your acceptance of such changes or modifications.

### 2. <u>Manufacturing Standards.</u>

- All glass water pipes Products sold under the RooR Tech Brand (a) shall consist of Schott glass and Lenz laborgasinstrumente ground fittings and joints, (b) shall utilize "in-tube" filtration systems, (c) shall not include carbon adapter, and (d) shall remain overall distinctive with notable styling differences from the RooR Brand.

- All glass Products sold under the RooR Tech Brand shall be of superior craftsmanship quality, using high end raw materials and shall be of quality at least equal to or superior to the RooR Brand's glass products line.

- All apparel Products sold under the RooR Tech Brand must be of quality at least equal to or superior to the RooR Brand's apparel line, including with respect to fiber, fabric and construction techniques.

- Pricing for all Products under the RooR Tech Brand shall reflect the standard of quality set forth herein and be consistent with the RooR Brand to maintain the top shelf image

91004-2112/LEGAL20889116.8

The appropriate notice for each of the Trademarks as of the latest update of this Policy is set forth in the Trademark chart attached hereto as **Exhibit A**. If marks currently listed in the chart with a ™ become registered, they will be updated with the ® symbol in the next revision of this Policy.

The ® or ™ symbol, as appropriate, should appear in the upper right corner of the mark (in the same location a footnote number would appear). It should be used at a minimum the first time a mark appears in text and in all prominent usages in which the mark is set apart from other text. Every appearance of a logo or logotype or a Trademark used on any Product packaging should always be marked with the appropriate Trademark symbol.

    5.3.   <u>Use of Logos, Logotypes, Brand Icons, Symbols, Illustrations and Product Photographs</u>. All use of any Brand logos, logotypes, brand icons, symbols and illustrations and the use of any photographs of Products must be used under the terms of your Agreement and in strict accordance with the provisions of the Policy. You may not modify, crop, distort, morph or animate any such item in any manner without the express written permission of Licensor in each instance.

    5.4.   <u>Use of Mark within Company Name or Domain Name</u>. Registration and/or use of a business name or assumed business name which is comprised of any Trademark in any way, shape or form is strictly prohibited. Registration and/or use of a domain name wherein the second level is comprised of any Trademark in any way, shape or form is also strictly prohibited, except with the prior written approval of Licensor.

    5.5.   <u>Chart of Current Marks</u>. A chart of current Trademarks (registered and unregistered), and the appropriate symbol and descriptor(s) to be used as of the date of the last update of this Policy, is set forth on **Exhibit A** hereof.

**6.**    **<u>Intellectual Property Protection and Indemnification</u>.**

    6.1.   <u>Protection</u>. You agree to immediately notify Licensor of any infringement, misappropriation or violation of any patent, copyright, trademark, trade secret or other proprietary right of Licensor that comes to your attention. In the event of any such infringement, misappropriation or violation relating to your activities or any activities of your employees, agents, representatives, distributors, dealers, sales representatives or customers, you agree to take all steps reasonably necessary to terminate any such infringement, misappropriation or violation. Licensor will have exclusive control over the prosecution and settlement of any legal proceeding to enforce, to recover damages on account of any infringement, misappropriation or violation of, or to defend any of its proprietary rights. You agree to: (a) provide such assistance related to such proceeding as Licensor may reasonably request; and (b) assist Licensor in enforcing any settlement or order made in connection with such proceeding.

    6.2.   <u>Third Party Consents</u>. To the extent that you sell, reference or identify any products and/or services, or utilize any trademark, service mark, trade name, trade dress, logo, logo type, tagline, icon or any other intellectual property (registered or unregistered) with respect to any products and/or services (the "***Content***") of any third party not a signatory to your Agreement (each, a "***Third Party***"), you hereby represent and warrant that: (i) your use of the



of the RooR Brand line and to establish the RooR Tech Brand as an equally high-quality brand.

**3.     Advertising and Collateral Material.**

All advertising and collateral materials must be produced in strict accordance with this Policy, the specific terms of your specific Agreement, and correct usage and attribution of all Brands. Use of any logos, logotypes, taglines, icons, illustrations or Product photos must be pursuant to your Agreement, and in conformance with this Policy. All materials must be submitted to Licensor and approved in writing prior to any use or distribution thereof and must comply with the following:

  3.1.     Visual Requirements.

    (a) In the use of illustrations and photographs, if a particular style is featured, a correct Product name must accompany the illustration or photo.

    (b) Use of the Brand logo is required in any and all advertisements.

  3.2.     Pricing. If an advertisement (or collateral materials) contains pricing information, it must be current and accurate.

**4.     Packaging.**

All Products must be sold in packaging approved by Licensor.

**5.     Trademarks.**

  5.1.     Proper Trademark Use. You must comply with the following usage guidelines whenever using any Trademark:

    (a) Always use the marks exactly (as set forth in **Exhibit A**) without varying spelling or spacing, abbreviating, adding or deleting hyphens, breaking into two or more words, combining marks, pluralizing, making possessive or otherwise altering the marks in any manner.

    (b) Keep Trademarks visually distinct from other text, images or materials. Capitalizing, bolding, italicizing and using a logotype are common ways of accomplishing this.

    (c) Provide a proper Trademark notice as described below.

  5.2.     Proper Notice. A proper trademark symbol must be used in connection with all Trademarks. Depending on the mark's status, there are two proper notices for the Trademarks:

    (a) ® indicates a trademark registered in the United States.

    (b) ™ indicates a trademark that is not registered, but used as a trademark.



Third Party Content does not and will not violate, misappropriate or infringe any copyright, patent, trademark, service mark, trade secret or any other personal, privacy or moral right or any other intellectual property or proprietary right arising under the laws of any jurisdiction of any person or entity (a *"Third Party Right"*); (ii) you have obtained any and all necessary consents for the use of the Third Party Content; and (iii) you will not place Third Party Content within close proximity to Licensor Content, or otherwise directly or indirectly imply or use Content to imply Licensor's sponsorship, affiliation, or endorsement of Third Party Content.

6.3.     Indemnification.  You agree that you will at all times defend, indemnify and hold harmless Licensor, his affiliates and all officers, shareholders, directors, managers, members, heirs, successors and assigns of each of the foregoing (collectively, the *"Indemnified Parties"*) from and against, and pay and reimburse the Indemnified Parties for, any and all liabilities, obligations, losses, damages, costs or expense (including interest, penalties and reasonable attorneys' fees) incurred in connection with any Third Party claims to the extent arising out of, resulting from or relating to: (i) any claim of violation of a Third Party Right; (ii) any representation, warranty or covenant by you contained herein being untrue in any respect or being breached in any manner; (iii) any alleged negligent, strict liability or intentional act or omission on your part or on the part of your employees or agents in the performance of your obligations set forth in this Policy; or (iv) an alleged breach of any agreement to which the Indemnified Parties and you are parties.  In connection with any claim or action described in this Section 6.3, Licensor will cooperate with you (at your expense) in connection with the defense and settlement of the claim.  You may not settle the claim without Licensor's prior written consent.  Further, Licensor may participate in the defense and settlement of the claim.

7.     **General Rules**.

7.1.     You acknowledge that all rights in and to the Trademarks are the sole and exclusive property of Licensor and that all goodwill generated through your use of any of the Trademarks shall inure solely to the benefit of Licensor.

7.2.     You may not use any logo, logotype, icon, photograph or illustration of Licensor unless specifically authorized in your Agreement.

7.3.     You may not copy or publish the Trademarks, except as expressly authorized by Licensor herein or in your Agreement.  Under no circumstances may you license, sublicense, assign, sell or otherwise transfer any right conferred to you to use the Trademarks, without the prior written consent of Licensor.  You may not alter the Trademarks in any manner, including size, proportions, colors, elements, additions, etc., or animate, morph or otherwise distort or modify its perspective or appearance, without Licensor's prior written consent.

7.4.     All use of the Trademarks and the Brands is subject to review and approval by Licensor, and this Policy is not intended to be a complete statement of Licensor's requirements regarding proper Trademark usage.  Licensor reserves the right to object to and disapprove of any use of its Trademarks that it deems to be undesirable, improper or unlawful, even if such use is not expressly prohibited by this Policy or your Agreement.



7.5.    Your use may not be obscene or pornographic, and may not be disparaging, defamatory or libelous to Licensor or any other person, product or entity.

7.6.    Your use may not infringe any of Licensor's intellectual property or other rights, may not violate any state or federal laws, and must comply with international intellectual property laws.

7.7.    You agree to Licensor's periodic inspection of your use of the Trademarks as necessary to confirm such use conforms to this Policy.   Any non-conforming use must immediately be brought into conformance.  Alternatively, Licensor may, at its sole and absolute discretion, elect to terminate all rights of use of its Trademarks, as well as your Agreement.

7.8.    Licensor may from time to time update the Trademarks to include other content, including other or new Trademarks, terms, format and design (the "*New Content*").  The same terms set forth herein shall apply to any New Content.  You shall use the New Content and discontinue use of any outdated Trademarks.



EXECUTION VERSION

## EXHIBIT A – TRADEMARK CHART

*Please note that this chart may not reflect a comprehensive list of all of Licensor's Trademarks.*

5.     U.S. Trademark Registration Number 3,675,839 for the word mark "ROOR" and its logo in association with goods further identified in the registration in international class 034.

6.     U.S. Trademark Registration Number 2,307, 176 for the word mark "ROOR" and its logo identified below in association with goods further identified in the registration in international classes 025 and 034.

7.     U.S. Trademark Registration Number 2,235,638 for the word mark "ROOR" and its logo identified below in association with goods further identified in the registration in international class 021.

8.     Any and all other registered or unregistered trademark rights in the word mark "ROOR" and in the marks shown below:







**SCHEDULE D**

**RENEWAL TERM SALES**

**[TBA]**

This FIRST AMENDMENT TO LICENSE AGREEMENT is hereby entered into on this the 27 day of February , 2015, (the "effective date") between Martin Birzle, an individual, ("*Licensor*") and Sream, Inc. a California Corporation ("*Licensee*")

## RECITALS

WHEREAS, Licensor and Licensee have entered into a Licensing Agreement dated as of August 1, 2013, a copy of which is attached hereto as Exhibit A (the "License Agreement"); and

WHEREAS, Licensor and Licensee desire to amend Sections 2.4, and 9 of the License Agreement concerning the rights associated with the Roor trademarks and brand.

NOW, THEREFORE, in consideration of the terms and conditions set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Definitions. Each initially capitalized term used herein without definition shall have the meaning ascribed to such term in the License Agreement.

2. Section 2.4 Amendments. It is hereby agreed that Section 2 of the License Agreement shall be amended, effective as of the date hereof, to read in its entirety as follows:

2.4    Licensee's Right to Enforce the Mark in the United States.  Throughout the term of the original agreement and this Amendment, and including all renewals, Licensor appoints the Licensee its legal representative herein, in the entire United States and its territories and possessions  to police and enforce all rights in the marks as set forth on Schedule A hereto; and further grants Licensee all of his unrestricted rights to sue to obtain injunctive relief for past and future infringement of the Mark, to recover damages that Licensor has or may have in profits and damages for past and future infringement of the Mark, including but not limited to the right to compromise, sue for and collect said profits and damages. The parties intend for the rights afforded under this paragraph to be tantamount to an assignment of all of said rights and responsibilities attendant there to. In other words, Licensor grants enforcement rights that amount to those of an assignee as contemplated by Ventures, LLC v. Pittsburg Wholesale Grocers, Inc., 2013 WL 1007666 N.D.Cal.,2013; Spin Master, Ltd v. Zobmondo Entertainment, LLC 2011 WL 3714772 C.D.Cal.,2011; and Waits v. Frito-Lay, Inc., 978 F.2d  1093, 1108-09 (9th Cir.1992)); and

Telebrands Corp v. Del Laboratories, Inc. Coty US and Coty Inc. 719 F. Supp.2d 283(
S.D.N.Y. 2010), and Calvin Klein Jeanswear Co. v. Tunnel Trading, 2001 WL 1456577
(S.D.N.Y. 2001).

Licensee further has the right to enter agreement with legal counsel for the
enforcement of said rights as licensee deems fit, including by way of contingency
arrangements, and Licensor acknowledges that said counsel shall be entitled to a lien on all
recoveries of third party infringement of the Mark. Licensee will, at its own cost: (a)
provide such assistance related to such proceeding as may reasonably request; and (b)
licensor will assist Licensee in enforcing any settlement or order made in connection with
such proceeding. In other words, Licensor agrees to reasonably cooperate with any
enforcement of the Mark in the United States, including without limitation, to produce
documents related to the ownership and/or use of the Mark, and to comply with deposition
notices and/or subpoenas.

3. Term of Amendment. This Amendment modifies section 9 of the Original License Agreement
as follows:

9.4.    Renewal Term. The original Agreement between the parties is hereby renewed
and extended in conformity with paragraph 9.1. The Agreement shall be for a continuous
term beginning on the Effective Date of this Amendment and ending on the day preceding
the Fifth (5) anniversary of the Effective Date of this amendment *("First Renewal Term"),*
and; thereafter the agreement shall automatically renew for one five (5) year term on the same
terms and conditions as this Renewal term , (the *"Second Renewal Term* ") except for such
terms and conditions that are made applicable solely to either the Initial Term or the
First Renewal Term) as set forth in the Original Agreement and Modification
Agreement, or as otherwise modified from time to time by the parties. The Initial Term,
together with the First Renewal Term, is collectively referred to in this Agreement as the
"Term." Notwithstanding the foregoing, either party may terminate this Agreement prior
to the expiration of the Term pursuant to Sections 9.2 and 9.3, and with the effect set
forth in, Section 9.4.

4. Full Force and Effect. Except as specifically modified or amended by the terms of this
Amendment, the License Agreement and all provisions contained therein are, and shall continue, in full
force and effect and are hereby ratified and confirmed.

5. Counterparts. This Amendment may be executed in any number of separate counterparts, and/or
by facsimile transmission, each of which when executed shall be deemed to be an original and all of
which together shall constitute a single instrument binding upon the Parties.

6. Miscellaneous. This Amendment shall be binding upon all the parties to the License Agreement and their respective successors and assigns. This Amendment shall be governed by, and construed and enforced in accordance with, the internal laws in effect in the State of California and New York.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

Agreed and Accepted:

MARTIN BIRZLE:

Agreed and Accepted:

SREAM INC.

By:_____  _____
                                Title